*543 OPINION.
Steknhagen:
The taxpayer, relying upon article 222, Regulations 45, urges that, in 1918, its Mines Nos. 1 and 2 had reached their normal production, and therefore the expenditures for cars, motors, machines, rails, ties, switches and frogs, when made, were properly deductible as ordinary and necessary business expenses. The argument is similar- to that considered in the Appeal of Bruin Coal Co., 1 B. T. A. 83, and Appeal of Winifrede Coal Co., 1 B. T. A. 566, the former being relied upon by the taxpayer and the latter by the Commissioner. These decisions indicate the difficulty of regarding the article as an authoritative construction of the statute. Under it, the deductibility of any item, after a mine has reached “the development stage,” depends first upon whether it is to be called a “ major item ” or a “ minor item.” This Board must apply the statute directly to the facts and may not insert into the statute a classification which is not there expressly or by clear implication. When the statute provides for the deduction of ordinary and necessary expenses, the Board will determine whether, all things considered, the expenses in question are such, and this determination should not be made to depend alone upon whether they are major or minor items. Such an inquiry would only inject into the problem an additional question no simpler than the primary question. The article also adds, as a factor of deductibility, that the item is “ necessary to maintain the normal output.” We think this is unauthorized and, to the extent that the opinion in Appeal of Bruin Coal Co., 1 B. T. A. 83, adopts this criterion, it is overruled. In the Winifrede *544 Appeal the properties in question, including mining machines, which are also in issue here, had a useful life of several years, and the Board held them to be capital items and their cost not deductible as expenses.
In the present record, the taxpayer’s engineering witness testified that all of the items in question would last more than a year, except for an accident, such as the collapse of the roof of the mine. It also appears that some of this property was used in Mines Nos. 1 and 2 until those mines were exhausted in 1922. The machines were thereafter rebuilt. Some of the cars were used in Mine No. 3. In such circumstances, it is our opinion that their cost should not be deducted so as to reduce taxable net income of the year of purchase, merely because they may serve to maintain production at its existing level. Like all other items of property used in the business of a taxpayer, they are subject to exhaustion, wear and tear, and obsolescence, and if, in a proper case, such exhaustion be measured by the units of production, this would be a normal method of recovering the initial outlay during the period of useful life. The loss by casualty is expressly provided for by a deduction when it occurs, just as the amortization deduction has already been provided for.
We are of opinion, also, that the deduction of the alleged bad debt was properly disallowed by the Commissioner. Whether there ever was a debt on this account owing by Nicoll is doubtful. From the contract it would seem that Nicoll’s liability for the purchase price of coal was only a secondary liability, if any. We need not determine that question. Nicoll denied liability.- But the coal had been shipped, and the Fuel Administration distributed it through the coal pool of the Lower Lake ports. Just what this was, or how it operated, does not clearly appear, and we can not determine to whom the taxpayer could rightfully look for responsibility for proper delivery. We are told that it could not look to the United States, while, at the same time, it is said that the United States sequestered the coal. However, it was never supposed that the coal was lost. Apparently, the administration of the pool involved some temporary confusion until deliveries and liability could be traced. This was done and the amount was paid almost entirely in little more than a year — not a long time under the circumstances.